## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | **COMPLAINT** |
| ANIMAL WELFARE INSTITUTE, | |
| *and* | Court No.  1:22-cv-339 |
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | |
| *Plaintiffs* | |
| v. | |
| DEB HAALAND, *in her official capacity as Secretary of the U.S. Department of the Interior*, | |
| *and* | |
| U.S. DEPARTMENT OF THE INTERIOR, | |
| *Defendants*. | |

## INTRODUCTION

1.      Plaintiffs Center for Biological Diversity, Animal Welfare Institute, and Natural Resources Defense Council, Inc. (collectively "Plaintiffs") challenge the Secretary of the Interior Deb Haaland and the Department of the Interior's ("Defendants") unreasonable delay in responding to a 2014 petition ("the Pelly petition") submitted under the Administrative Procedure Act ("APA"). The Pelly petition requested that Defendants "certify" Mexico under the Pelly Amendment to the Fishermen's Protective Act of 1967 ("Pelly Amendment" or "Pelly") due to Mexico's ongoing failure to halt illegal fishing of and international trade in endangered totoaba, a large, imperiled fish. *See* 22 U.S.C. § 1978(a)(2). This take or killing and trade

1

violates and "diminishes the effectiveness" of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") and is contributing to the imminent extinction of the vaquita porpoise. *See id.* Defendants' eight-year delay in responding to the petition is unreasonable and therefore violates the APA, particularly as likely only around 10 vaquita remain on Earth.

2.      Vaquita face only one threat: they become entangled and drown in Mexican fishing gear, including in gear set illegally to catch totoaba. Totoaba are traded on the black market from Mexico to China, where the totoaba's swim bladder is in high demand.

3.      Vaquita and totoaba are both listed under Appendix I of CITES, and thus the agreement prohibits international, commercial trade in both species. Mexican law also prohibits totoaba fishing.

4.      Yet for years, Mexico has failed to enforce these bans on totoaba fishing and trade, and as a result, the vaquita population has plummeted. If Mexico does not take immediate and concerted action to increase enforcement, the vaquita may imminently go extinct.

5.      Under the Pelly Amendment, "[w]hen the Secretary of the Interior . . . finds that nationals of a foreign country . . . are engaging in trade or taking which diminishes the effectiveness of any international program for endangered . . . species, the Secretary . . . shall certify such fact to the President." 22 U.S.C. § 1978(a)(2). Upon the Secretary's certification of a nation, the President is authorized "to prohibit . . . the importation . . . of any products from the offending country." *Id.* § 1978(a)(5).

6.      The Pelly petition, filed September 29, 2014, requested that the Secretary of the Interior certify Mexico for "diminish[ing] the effectiveness" of CITES for the continued trade

and taking totoaba, pursuant to the APA and the Pelly Amendment. 5 U.S.C. § 555(b); 22 U.S.C. § 1978(a)(2).

7.      Defendants have not provided any substantive response to the petition as of the date of this Complaint's filing.

8.      Defendants' delay in responding to the 2014 petition is unlawful, unreasonable, and violates the APA. 5 U.S.C. §§ 555(b), (e), 706(1). More than eight years have passed since the petition's filing, and during this time, totoaba continues to be taken in Mexico, illegal trade is ongoing, and violations of CITES continue, causing the vaquita to decline to near-extinction.

9.       Plaintiffs file this Complaint to compel Defendants to respond substantively to the Pelly petition by a date certain, as well as Plaintiffs' fees and costs associated with the litigation.

## JURISDICTION

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i). This civil action is commenced against agencies and officers of the United States and arises out of the Pelly Amendment, which provides for an embargo "of any products from [an] offending country" certified under the statute, as well as for administration and enforcement of any such embargo, and the APA, which requires agencies to respond to a petition within a reasonable time. 22 U.S.C. § 1978(a); 5 U.S.C. § 555(b), (e). The requested relief is authorized under the APA, the Declaratory Judgment Act, and the Court's equitable powers. 5 U.S.C. § 706; 28 U.S.C. §§ 2201–2202.

## PARTIES

11.     Plaintiff Center for Biological Diversity ("the Center") is a 501(c)(3) nonprofit corporation incorporated in the State of California that maintains offices across the country—

including in Washington, DC, California, Arizona, and Oregon—and in Baja California Sur, Mexico. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats both in the United States and abroad. The Center has over 89,000 active members and around 1.7 million online activists.

12.     The Center and its members have a strong and longstanding interest in protecting imperiled marine mammals and fish like the vaquita and the totoaba. Through its International and Oceans Programs, the Center has worked for years to protect marine mammals within the United States and abroad that are threatened by unsustainable or harmful fishing practices, including through advocacy, litigation, and participation as appointed members of five take reduction teams under the Marine Mammal Protection Act ("MMPA"). The Center has a long history of actively advocating for protection of imperiled vaquita and totoaba within Mexico, to the U.S. government, and at numerous international forums.

13.     Members of the Center reside throughout the United States, in Mexico, and in other countries. The Center has members who have visited and have specific plans to return to the vaquita's habitat in Mexico's Upper Gulf of California. For example, Mr. Brett Hartl, a member who resides in Arizona, lived in the Upper Gulf in 2003 for ten weeks and traveled extensively in the area. He again visited San Felipe, near the vaquita's habitat, in 2009 and 2018 and attempted to view, study, and photograph the vaquita. Mr. Hartl had planned to return to the Upper Gulf in September 2020 but postponed the trip due to the Covid-19 pandemic. Mr. Hartl now has plans to return to the Upper Gulf in late fall of 2023 to again attempt to view the vaquita and other wildlife. Given Mr. Hartl's concrete and ongoing interests in viewing the vaquita, Defendants' failure to grant the Pelly petition and take other available steps to address the vaquita's imminent extinction is causing him anxiety and emotional distress. Another Center

member, Mr. Taylor McKinnon, has been visiting the Upper Gulf regularly since childhood. He

has visited San Felipe and the surrounding coast six times, including in 2016, 2017, and 2018, to

kayak, birdwatch, take photos, and look for vaquita. In November 2022, Mr. McKinnon again

visited the Upper Gulf to kayak, and he has plans to visit Bahia Adair in fall of 2023 to kayak in

the area; observe and photograph birds and wildlife, including vaquita; and saltwater flyfish. His

family also owns a home in Puerto Lobos, at the southern edge of the vaquita's habitat, and Mr.

McKinnon plans to visit next year, as he has many times in the past, to kayak and wildlife watch

in the area. Mr. Alejandro Olivera is a member of the Center and Natural Resources Defense

Council, Inc. who resides in California Baja Sur, Mexico and regularly visits the Upper Gulf and

the vaquita's habitat, including six trips over the past 11 years. Each time Mr. Olivera visits the

Upper Gulf, he attempts to view a vaquita, including from on the water, as well as other marine

mammals and sea turtles. He has also seen gillnets being used near San Felipe, directly witnessed

totoaba fishing, and has seen dead totoaba in the water and on the shoreline. Mr. Olivera has

concrete plans, including already-booked travel arrangements for late-December 2022, to visit

the vaquita habitat to once again attempt to view vaquita from the water, and he will continue to

return to the Upper Gulf regularly in the future, as he has in the past.

14.     Plaintiff Animal Welfare Institute ("AWI") is a non-profit animal advocacy

organization with its principal place of business in Washington, DC. Since its founding in 1951,

AWI's mission has been to end human-inflicted animal suffering and exploitation, including by

vigorously defending animals' interests through the law. AWI has a longstanding and well-

established interest in protecting the lives and habitats of wildlife, including marine wildlife,

from harassment, encroachment, and destruction. AWI's wildlife advocacy efforts include

diligent work to protect all fauna—terrestrial and marine—from suffering caused by people; to

conserve and recover threatened and endangered species; and to secure protections for animals by engaging with policymakers, scientists, and industry at state, federal, and international levels.

15.     AWI advocates for the protection of marine wildlife, including cetaceans, in Mexico and across the globe. Its advocacy efforts include speaking on behalf of marine species in international forums such as the International Whaling Commission ("IWC," including its Scientific Committee), CITES, World Heritage Convention, and various United Nations Regional Seas Programs; educating constituents and members about cetaceans and the threats they face; and monitoring legislation and research activities that may affect their well-being.

16.     AWI promotes increased protections for marine mammals from unsustainable fishing practices around the globe, especially those practices that cause death due to entanglement in fishing gear. AWI is a member of the IWC's Bycatch Mitigation Initiative Standing Working Group and frequently comments on Marine Stewardship Council fisheries assessments on the impacts of fisheries on cetaceans. AWI seeks an end to the indiscriminate use of gillnets, which are responsible for the deaths of hundreds of thousands of marine mammals each year and have driven the critically endangered vaquita to the edge of extinction. In its efforts to save the vaquita, AWI has expended considerable time and organizational resources to meet with government officials in Mexico and the United States and to advocate for the species in various international forums; organized and participated in events to educate governmental delegates to international meetings about the species and its threats; and collaborated with other international and non-governmental organizations on projects to promote the protection and recovery of the species.

17.     AWI has nearly 26,800 members worldwide, including members in the southwest United States and in Mexico who reside near the Upper Gulf of California. It also has nearly

170,000 online activists. AWI has members who strongly desire increased protections for the

vaquita and its habitat to increase the vaquita's likelihood of recovery. AWI members live near

or have traveled to the Upper Gulf of California and have specific plans to return to try to

observe vaquita. For example, an AWI member lives in the region near the vaquita's habitat and

has a longstanding interest in the vaquita's conservation. The member regularly views the

vaquita's habitat and has witnessed illegal fishing there. The member also actively advocates for

vaquita protection, including through supporting local Mexican organizations focused on saving

the vaquita and promoting legal, sustainable fishing in Upper Gulf of California communities.

18.     Plaintiff Natural Resources Defense Council, Inc. ("NRDC") is a not-for-profit

membership corporation founded in 1970 and organized under the laws of the State of New

York. NRDC maintains offices in New York, New York; Washington, DC; San Francisco and

Santa Monica, California; Chicago, Illinois; Bozeman, Montana; and Beijing, China. NRDC has

hundreds of thousands of members and online activists. NRDC's purposes include the

preservation, protection, and defense of our nation's biodiversity and environment. NRDC has

long been active in efforts to protect endangered species generally and the vaquita specifically.

19.     NRDC has had a dedicated marine mammal protection project for more than 20

years, focused on limiting the harm to marine mammals from ocean noise, bycatch, habitat

degradation, and other threats. NRDC has been working to save the vaquita from extinction for

more than 15 years, including efforts directly targeted at eliminating the illegal fishing and trade

in totoaba from Mexico to China.

20.     NRDC members regularly observe, visit, study, work to protect, and delight in the

presence of marine mammals in the wild, including the vaquita. NRDC members intend to

continue doing so in the future, including NRDC member Mr. Alejandro Olivera, discussed in paragraph 13, above.

21.     Plaintiffs and their members derive aesthetic, recreational, scientific, educational, conservation, and other benefits from the existence of vaquita in the wild. These interests have been, are, and will be directly, adversely, and irreparably affected by Defendants' failure to respond to Plaintiffs' petition. As the vaquita population declines, Plaintiffs' members are less likely to be able to view the vaquita in the wild. Further, these members' enjoyment of viewing the vaquita's marine habitat is decreased by observing illegal fishing and vaquita-killing gillnets in the vaquita's waters. Plaintiffs' members also attempt to view other wildlife in the Upper Gulf, including whales and sea turtles, that can become entangled and die in illegal gillnets, reducing members' opportunity to see these animals. Moreover, Plaintiffs' members are directly injured by Defendants' delay, as it stymies their vaquita advocacy by creating a legal limbo and hampering their ability to effectively work to combat illegal totoaba fishing and trade to save the vaquita.

22.     Plaintiffs' members will continue to be injured by Defendants' unlawful actions unless and until this Court provides the relief prayed for in this Complaint. Should the Court grant Plaintiffs' requested relief, the Service will be obligated to respond substantively to Plaintiffs' Pelly petition, which will remedy the violation of Plaintiffs' procedural right under the APA to obtain a response to their petition within a reasonable time. In addition, if compelled to provide a substantive response, Defendants are highly likely to grant the petition because Mexico has in fact violated and diminished the effectiveness of CITES through its longstanding failure to enforce the bans on taking and trade of totoaba, which has contributed substantially to the vaquita's precipitous decline. As detailed below in paragraphs 70–78, the United States

government proposed sanctioning Mexico for its failure to meet its CITES obligations in March 2022, publicly stating its belief that Mexico has not curbed illegal fishing or illegal, international trade of totoaba and that Mexico is not effectively implementing CITES.

23.     Should Defendants grant the petition, Mexico is highly likely to increase enforcement, thereby limiting totoaba trade and fishing to protect the vaquita, to avoid sanctions under the Pelly Amendment. Mexico is a high-volume trade partner with the United States, including in wildlife products, and is one of the top seafood exporters to the United States. Mexico has a history of responding positively to embargoes. For example, the Mexican government issued stronger dolphin protection regulations for its eastern Pacific Ocean tuna fisheries in the early 1990s following an embargo and issued improved sea turtle protections in its Pacific shrimp fisheries in 2010 and 2021 following embargoes. Mexico issued stronger vaquita protection regulations following a limited 2020 U.S. embargo related to vaquita protection under the MMPA; however, a broader embargo under Pelly is needed to pressure Mexico to fully enforce those regulations. Mexico is likely to increase enforcement and vaquita protections upon certification by Defendants, even without trade sanctions imposed, because the United States has demonstrated its willingness to issue embargoes in the past and has already recommended an embargo against Mexico under CITES. Other nations have improved conservation following Pelly certifications in the past. Moreover, Plaintiffs' members would be provided emotional relief by finally receiving a decision from Defendants.

24.     Defendant Deb Haaland is the Secretary of the U.S. Department of the Interior. In this capacity, Secretary Haaland directs all business of the Department of the Interior. Under the Pelly Amendment, Secretary Haaland is responsible for determining whether to "certify" nations if trade or taking by foreign nationals is diminishing the effectiveness of international

agreements for endangered species. In her official capacity, Secretary Haaland is responsible for the violations alleged in this Complaint.

25.     Defendant U.S. Department of the Interior is an agency led by the Secretary of the Interior. The U.S. Department of the Interior is responsible for the violations alleged in this Complaint.

## LEGAL BACKGROUND

### A.     The Convention on International Trade in Endangered Species of Wild Fauna and Flora

26.     CITES is a multilateral agreement governing trade in imperiled species. CITES, *opened for signature* March 3, 1973, 27 U.S.T. 1087, 993 U.N.T.S. 243 (entered into force July 1, 1975). CITES recognizes that "wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems" and that "international co-operation is essential for the protection of [these] species . . . against over-exploitation through international trade." *Id.*, preamble.

27.     To receive protection under CITES, species must be included on one of CITES' Appendices, and each Appendix offers a different level of protection.

28.     Species included on CITES Appendix I are "threatened with extinction" and are thus "subject to particularly strict regulation in order not to endanger further their survival." CITES, art. II(1). CITES bans all commercial, international trade in Appendix-I species. *Id.*, art. III(1), (3).

29.     CITES further requires that each Party "shall take appropriate measures to enforce the provisions of [CITES] and to prohibit trade in specimens in violation thereof." CITES, art. VIII(1).

30.     The United States, Mexico, and 182 other nations are Parties to CITES.

**B.    The Pelly Amendment**

31.    Enacted in 1971 and amended in 1978, the Pelly Amendment provides the United States leverage to prompt other nations' compliance with international conservation agreements through trade restrictions.

32.    The Pelly Amendment requires that:

> When . . . the Secretary of the Interior, in consultation with the Secretary of State, finds that nationals of a foreign country, directly or indirectly, are engaging in trade or taking which diminishes the effectiveness of any international program for endangered or threatened species, the Secretary . . . shall certify such fact to the President.

22 U.S.C. § 1978(a)(2).

33.    The Pelly Amendment further requires the Secretary to "(A) periodically monitor the activities of foreign nationals that may affect . . . international programs . . .; (B) promptly investigate any activity that . . . may be cause for certification . . . ; and (C) promptly conclude; and reach a decision with respect to; any [such] investigation." 22 U.S.C. § 1978(a)(3).

34.    A person or organization may petition for a Pelly certification.

35.    Under the Pelly Amendment, an "international program for endangered or threatened species" is "any ban, restriction, regulation, or other measure in effect pursuant to a multilateral agreement which is in force with respect to the United States, the purpose of which is to protect endangered or threatened species of animals." 22 U.S.C. § 1978(h)(4).

36.    CITES is an "international program for endangered or threatened species" under Pelly.

37.    The Pelly Amendment defines "taking" to include harming, killing, trapping, and collecting an animal or attempting to do so. 22 U.S.C. § 1978(h)(5).

11

38.     Upon receiving a Pelly certification from the Secretary, the President is authorized to "direct the Secretary of the Treasury to prohibit . . . the importation into the United States of any products from the offending country." 22 U.S.C. § 1978(a)(5). Further, the President "shall" notify Congress of his decision within 60 days of the Secretary's certification, and if the President "fails" to prohibit importation or does not prohibit "all fish . . . or wildlife products" from the certified country, "the President shall inform the Congress of the reasons." *Id.* § 1978(b).

39.     Once products are prohibited, the Pelly Amendment makes any subsequent importation illegal. 22 U.S.C. § 1978(c).

## C.     The Administrative Procedure Act

40.     The Administrative Procedure Act requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it," 5 U.S.C. § 555(b), and requires that agencies give "prompt notice" if they deny a petition, providing "a brief statement of the grounds for denial," *id.* § 555(e).

41.     The APA provides a cause of action to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Under the APA, an agency action includes an agency's "failure to act." *Id.* § 551(13). The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

**FACTUAL BACKGROUND**

**A.     Totoaba Fishing and Trade and the Vaquita's Perilous Decline**

42.     The vaquita (*Phocoena sinus*) is the world's smallest porpoise, reaching around five feet in length, with dark grey patches around its eyes and mouth. Vaquita inhabit only one place on Earth: Mexico's Upper Gulf of California.

43.     Vaquita are critically endangered. Likely only around 10 vaquita remain in existence.

44.     The Parties to CITES included the vaquita on CITES Appendix I in 1979. The United States listed the vaquita under its Endangered Species Act ("ESA") in 1985. 50 Fed. Reg. 1056 (Jan. 9, 1985) (codified at 50 C.F.R. § 17.11(h)). The International Union for Conservation of Nature ("IUCN") has assessed the vaquita as "Critically Endangered."

45.     The vaquita's sole threat is entanglement in gillnet gear. Gillnets are fishing gear hung vertically in the water column. In addition to capturing target fish, gillnets also often capture and kill non-target fish and other marine life, including marine mammals and turtles that drown once entangled.

46.     The vaquita's population has declined due to entanglement in gillnet gear set in the region's fisheries, including in the illegal totoaba fishery.

47.     Totoaba (*Totoaba macdonaldi*) are large, schooling marine fish that inhabit the Gulf of California and grow to around five feet in length. A portion of the totoaba's annual spawning habitat overlaps the vaquita's habitat in the Upper Gulf.

48.     The totoaba's swim bladder, also referred to as "maw," is in high demand in parts of China, as it resembles the bladder of a now-nearly-extinct Chinese fish called the bahaba. Totoaba swim bladders are believed by some to have medicinal properties. Large swim bladders

are also purchased for investment purposes, collectables, or as gifts. Totoaba swim bladders can sell for extraordinary prices, reaching $46,000 to even $100,000 per kilogram by some reports.

49.     Historically, the totoaba population declined due to overfishing, and in 1975, Mexico banned totoaba fishing.

50.     In 1977, the CITES Parties included totoaba on Appendix I of the convention. As a result, CITES bans commercial, international trade in wild-sourced totoaba and totoaba parts and derivatives.

51.     In 1979, the United States listed totoaba as endangered under the ESA. 44 Fed. Reg. 29,478 (May 21, 1979) (listing *Cynoscion macdonaldi*, a taxonomic synonym of *Totoaba macdonaldi*) (codified at 50 C.F.R. § 17.11(h)).

52.     The IUCN assessed totoaba as "Vulnerable" in 2021 because it is facing a high risk of extinction in the wild.

53.     Around 2010, when an estimated 200 vaquita remained, illegal totoaba fishing within the vaquita's habitat surged due to increased demand in China.

54.     Accordingly, in 2014, the Comité Internacional para la Recuperación de la Vaquita ("CIRVA"), a group of the world's foremost vaquita experts, formally recommended "that all available enforcement tools, both within and outside Mexico, be applied to stopping illegal fishing, especially the capture of totoabas and the trade in their products."

55.     Yet Mexico did not act upon this recommendation, and as a result, the vaquita population plummeted.

56.     In 2016, CIRVA reported that "extensive evidence of totoaba poaching" had continued, and the vaquita population fell to around 60 individuals.

57.     In 2017, the group reported that "[i]llegal fishing activity for totoaba . . . continued at a very high level," and the vaquita population had declined to around 30 individuals.

58.     In July 2017, under immense international pressure, Mexico permanently banned gillnet fishing in the Upper Gulf. Yet in 2018, CIRVA stated that "high levels of illegal fishing for totoaba" continued in the vaquita's habitat and Mexico's "[e]nforcement efforts ha[d] been completely ineffective in reducing the illegal totoaba fishery." Experts wrote to the Mexican government with alarm, stating that "only about 10 vaquitas remained alive."

59.     In December 2019, the nonprofit organization Sea Shepherd Conservation Society reported sighting around 80 vessels setting and retrieving illegal gillnets in vaquita habitat in a single day. The organization estimated that around 500 totoaba were taken illegally that day.

60.     In March 2020, after years of urging Mexico to reduce vaquita bycatch and following litigation and a preliminary injunction by this Court, *Nat. Res. Def. Council, Inc. v. Ross*, 456 F. Supp. 3d 1292 (2020), the U.S. government banned the import of products from Mexican fisheries operating in the vaquita's habitat, 85 Fed. Reg. 13,626 (Mar. 9, 2020). The ban was enacted pursuant to the U.S. Marine Mammal Protection Act, which requires the National Marine Fisheries Service ("NMFS") to ban imports of any fish caught with gear that "incidental[ly] kill[s]" marine mammals "in excess of United States standards." 16 U.S.C. § 1372(a)(2). NMFS concluded that the Government of Mexico lacked a regulatory program comparable to the U.S. marine mammal regulatory program and that Mexico "failed to fully implement and enforce its existing laws and regulatory regime," including the gillnet ban. 85 Fed. Reg. at 13,627, 13,628.

61.     In response to this limited U.S. embargo, Mexico issued new regulations governing fishing in the vaquita habitat in September 2020, including banning the use, possession, and transport of gillnets in certain areas; requiring vessel monitoring and inspections at vessel departure and arrival; and prohibiting any fishing or unauthorized vessel within the vaquita's core habitat area, called the Zero Tolerance Area ("ZTA").

62.     However, the Mexican government has failed to fully implement and enforce these new regulations or its longstanding ban on totoaba fishing and trade.

63.     In December 2020, the IUCN Cetacean Specialist Group published data documenting substantial illegal fishing, including hundreds of fishing vessels in prohibited areas, mostly fishing with illegal gillnets. The group concluded that "illegal fishing remains at high levels and takes place day and night" within the vaquita habitat and "[i]llegal fishing remains uncontrolled."

64.     In 2021, IUCN issued a report finding that the totoaba population is decreasing and that there has been an exponential increase in poaching driven by illegal trade in its swim bladder to China since 2011. The assessment noted that Mexico's efforts to enforce conservation measures have been ineffective and that halting illegal fishing and trafficking in totoaba swim bladders is the totoaba's most urgent conservation need.

65.     The IUCN Cetacean Specialist Group published data documenting that between October 2021 and May 2022, illegal fishing vessels "were present inside the [Zero Tolerance Area] on 88% of the days observed . . . (120 of 147 days)," with more than 20 illegal vessels observed on 29 of the days.

66.     More recently, Sea Shepherd Conservation Society documented illegal vessel activities in the Zero Tolerance Area, including vessels engaged in illegal fishing, on all 23 days

it monitored between September 29 and December 1, 2022. On 9 days, over 20 illegal vessels were observed in the Zero Tolerance Area where vessel transit is banned under Mexico's vaquita regulations.

67.     For the vaquita to survive, scientists have concluded that Mexico must eliminate gillnet fishing in the area where the last few vaquita remain.

68.     Yet hope for the vaquita persists. During recent surveys, scientists observed vaquita calves, demonstrating that vaquita are continuing to reproduce. A recent study concluded that the vaquita population remains genetically healthy enough for the species to recover if gillnetting ends. Other marine mammal populations, like the Northern elephant seal, reached similarly low population numbers but avoided extinction and recovered.

**B.     International Concern over Mexico's Enforcement Failures**

69.     Numerous international bodies have raised serious concern with Mexico's failure to halt illegal totoaba fishing and trade.

**1.     CITES**

70.     In 2016, the CITES Standing Committee, a body that oversees the treaty's implementation, specifically "urged Mexico to strengthen implementation of CITES provisions that are applicable to totoaba." CITES, Summary Record of the 66th Meeting of Standing Committee, Geneva, Switzerland at 84, (SC66 SR, Doc. 58) (Jan. 11–15, 2016).

71.     Later that year, the CITES Conference of the Parties directed Parties to "increase law enforcement measures to prevent and address illegal fishing and trade" of totoaba and report on enforcement efforts. CITES CoP17 Decision 17.147.

72.     After reviewing those reports, in 2019, the CITES Parties directed Mexico to, *inter alia*, "take immediate and effective actions by 1 November 2019 in response to the threats

to totoaba and vaquita posed by illegal trade," including "to effectively prevent fishers and vessels from entering the Vaquita Refuge area" and "undertak[e] intelligence-driven operations and investigations for addressing illegal trade in totoaba." CITES CoP18 Decision 18.293.

73.    At a Standing Committee meeting in March 2022, the CITES Secretariat assessed Mexico's totoaba efforts and concluded that the CITES Parties' directive to Mexico that it "effectively prevent fishers and vessels from entering the vaquita refuge area *ha[d] not been implemented*." CITES, Totoaba (*Totoaba macdonaldi*): Report of the Secretariat to the 74th Meeting of the Standing Committee, Lyon, France ¶ 33, SC74 Doc. 28.5 (Mar. 7–11, 2022) (emphasis added).

74.    During that meeting, the U.S. government publicly stated its concern that Mexico had not curbed illegal fishing or illegal, international trade of totoaba. The United States stated it did not believe that CITES was being effectively implemented by Mexico. The United States proposed that the Standing Committee recommend the suspension of commercial trade with Mexico until measurable progress is made. CITES, Summary Record of the 74th Meeting of Standing Committee, Lyon, France at 57, SC74 SR Doc. 28.5 (March 7–11, 2022).

75.    The CITES Standing Committee highlighted that "fishers illegally operating in the vaquita refuge and zero tolerance area" must be urgently addressed, urged Mexico to "scale up and expand" surveillance and "strengthen measures to ensure that a 'zero tolerance policy' is strictly applied," and invited the CITES Secretariat to undertake a mission to Mexico to evaluate progress. CITES, Summary Record of the 74th Meeting of Standing Committee, Lyon, France at 58-59, SC74 SR Doc. 28.5 (March 7–11, 2022).

76.    In fall 2022, the CITES Secretariat issued a document further assessing Mexico's efforts. CITES, Totoaba (*Totoaba macdonaldi*): Report of the Secretariat to the 75th Meeting of

the Standing Committee, Panama City, Panama ¶ 17, SC75 Doc. 7.5 (Nov. 13, 2022). The Secretariat expressed "concerns about the effectiveness of [Mexico's] implementation" of regulations addressing fishing in the vaquita habitat. During its mission and on an unplanned visit to the waterfront in San Felipe, Mexico, near the vaquita habitat, the Secretariat documented "at least 15 vessels" departing illegally and believed to be headed to the Zero Tolerance Area in just over an hour without required inspection. Fishermen interviewed confirmed this is "a daily occurrence" and that fishing vessels operate "illegally . . . in plain sight without any consequence." *Id.* ¶ 15.

77.     At the recently concluded CITES Conference of the Parties ("CoP"), the United States submitted a document stating that Mexico's totoaba "actions have been neither sufficient nor effective as illegal fishing and trade continues unabated while the nearly extinct vaquita continue to drown in illegal gillnets targeting totoaba." CITES, Renewed and updated Decisions for CoP19 ¶ 9, CoP19 Doc. 29.2.2 (Sept. 16, 2022).

78.     In November 2022, the CITES Standing Committee reviewed Mexico's totoaba efforts and directed Mexico to submit a "compliance action plan" to improve enforcement by February 28, 2023. If Mexico fails to do so, the Secretariat "shall" recommend a trade suspension against Mexico. The CITES Standing Committee will review Mexico's compliance with the new plan at the next Standing Committee meeting in late 2023.

### 2.     Other International Forums

79.     In February 2022, the U.S. Trade Representative announced that it was requesting formal Environmental Consultations with Mexico pursuant to the U.S.-Mexico-Canada Agreement ("USMCA"), a first step in dispute resolution under the USMCA. The Consultations address "Mexico's USMCA . . . obligations relating to the protection of the critically endangered

vaquita porpoise . . ., the prevention of illegal fishing, and trafficking of totoaba fish." Press Release, U.S. Trade Representative, USTR Announces USMCA Environment Consultations with Mexico (Feb. 10, 2022), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2022/february/ustr-announces-usmca-environment-consultations-mexico.

80.     In 2019 and under the World Heritage Convention, the UNESCO World Heritage Committee reviewed Mexico's management of its Islands and Protected Areas of the Gulf of California World Heritage site, which covers the vaquita's habitat. The Commission "expresse[d] its utmost concern that despite [Mexico's surveillance efforts] . . . illegal fishing of totoaba has continued and even escalated in the Upper Gulf of California resulting in a threat of imminent extinction of the vaquita population." WHC, Decisions adopted during the 43rd session of the World Heritage Committee at 109, WHC/19/43.COM/18 (July 23, 2019). The Committee voted to inscribe the site on the List of World Heritage in Danger and directed Mexico to develop corrective measures for managing the site. *Id.* at 110. In 2021, the World Heritage Committee reported on these corrective measures and "reiterate[d] its utmost concern . . . that illegal fishing of totoaba has continued in the Upper Gulf" and that "the volume of illegally extracted totoaba products remains high." WHC, Decisions adopted during the extended 44th session of the World Heritage Committee at 84, WHC/21/44.COM/18 (July 31, 2021).

81.     In 2019, the International Whaling Commission's Scientific Committee issued a formal report "yet again express[ing] its disappointment and frustration that, despite almost three decades of repeated warnings, the vaquita's rapid decline to extinction continues because of [Mexico's] ineffective management measures." IWC, Report of the Scientific Committee, Nairobi, Kenya at 63–65 (May 10–13, 2019). The report recommends that Mexico increase

surveillance and enforcement, among other actions. *Id.* In 2022, the Scientific Committee reiterated its concerns and noted "evidence that clearly indicates that the vaquita population is still decreasing" and that "[g]illnets within the ZTA has increased since 2018," including "due to the continuation of illegal fishing for totoaba." IWC, Report of the Scientific Committee, Virtual Meeting at 153–54 (Apr. 25–May 13, 2022).

      **C.**     **The Pelly Petition and Defendants' Failure to Respond**

     82.    On September 29, 2014, the Center submitted the Pelly petition pursuant to the APA and Pelly Amendment requesting that the Secretary of the Interior certify Mexico for trade and taking of totoaba that "diminishes the effectiveness" of CITES. 5 U.S.C. § 555(b); 22 U.S.C. § 1978(a)(2).

     83.    The petition described the vaquita's precipitous decline; detailed how illegal fishing and trade in Mexico are driving that decline; and explained how CITES prohibits international, commercial trade in totoaba and requires Mexico to enforce that prohibition.

     84.    The petition explained that, under the Pelly Amendment, Mexican nationals are engaging in "taking" and "trade" of endangered totoaba that "diminishes the effectiveness" of CITES for two reasons. 22 U.S.C. § 1978(a)(2). First, by failing to enforce CITES' ban on trade in totoaba, Mexico is directly violating CITES and diminishing the treaty's effectiveness. Second, continued illegal fishing and trade in endangered totoaba threatens both the totoaba and the vaquita's existence, and thus Mexico's actions "diminish the effectiveness" of CITES more broadly, as the treaty is intended to conserve both species.

     85.    Having received no formal response from Defendants granting or denying the petition, on June 28, 2016, the Center sent a letter requesting that Defendants urgently grant the

petition. The letter documented ongoing, illegal totoaba fishing and trade and the vaquita's continued decline.

86.    Still having received no response to the petition, the Center sent another letter to Defendants in January 2017, again documenting continued illegal totoaba fishing and trade and further vaquita decline. The letter explained that Defendants' failure to respond to the Pelly petition constituted an "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

87.    On January 16, 2017, more than 60 conservation organizations, including AWI and NRDC, submitted a letter urgently requesting that Defendants certify Mexico under the Pelly Amendment for totoaba taking and trade.

88.    On April 11, 2017, the Fish and Wildlife Service ("the Service"), an agency within the Department of the Interior, sent a letter to the Center listing actions the Service had taken regarding totoaba and vaquita and stating that "the conservation of these endangered species remains, and always has been, a high priority for the Service." The Service stated that it "anticipate[d] concluding [its] investigation into the matter [i.e., the Pelly petition] within the next four or five months," i.e., by August or September 2017.

89.    Plaintiffs have continued to meet with and request updates from the Service and its staff regarding the Pelly petition since April 2017.

90.    In June 2020, the Center and AWI filed suit against Defendants over their unreasonable delay in responding to the Pelly petition. Complaint, *Ctr. for Biological Diversity v. Bernhardt*, No. 1:20-cv-01532 (D.D.C. June 11, 2020), ECF No. 1. Defendants filed a motion to dismiss alleging lack of jurisdiction, including arguing that the Court of International Trade had exclusive jurisdiction over the case. Mot. to Dismiss at 6–10, *Ctr. for Biological Diversity v.*

*Bernhardt*, No. 1:20-cv-01532 (D.D.C. Aug. 24, 2020), ECF No. 9 ("The Center's claim of

unreasonable delay on its petition for Pelly Amendment certification may proceed only in the

CIT." (citation omitted)). The plaintiffs subsequently filed a notice of voluntary dismissal

without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). Notice of Vol.

Dismissal, *Ctr. for Biol. Diversity v. Bernhardt*, No. 1:20-cv-01532 (D.D.C. Sept. 2, 2020), ECF

No. 11.

91.     More than eight years have passed since the Pelly petition was first filed and more

than five years have passed since the Service stated it would complete its investigation within a

matter of months.

92.     Despite the APA's requirement that an agency respond to a petition "within a

reasonable time;" despite the vaquita's imminent extinction if illegal totoaba fishing and trade

continue; and despite the Pelly Amendment's mandate that Defendants "shall" "promptly

investigate," "promptly conclude . . . any investigation," and "certify" nations for diminishing

the effectiveness of treaties, Defendants have failed to provide any substantive response to the

Pelly petition. Defendants' extraordinary delay in providing such a response is patently

unreasonable and therefore unlawful.

## CLAIM FOR RELIEF

### Failure to Timely Respond to Petition

93.     Plaintiffs reallege and incorporate by reference the allegations contained in all

preceding paragraphs of this Complaint.

94.     On September 29, 2014, the Center filed the Pelly petition requesting that the

Secretary of the Interior certify Mexico for trade and taking of totoaba that "diminishes the

effectiveness" of CITES, pursuant to the APA and the Pelly Amendment. 5 U.S.C. § 555(b); 22 U.S.C. § 1978(a)(2).

95.    Under the APA, agencies must respond to petitions "within a reasonable time," and a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 555(b), 706(1). The APA provides judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id.* § 702. "Agency action" includes the "failure to act." *Id.* § 551(13).

96.    More than eight years have passed since the Pelly petition was filed. Despite continued illegal totoaba fishing and trade and the vaquita's continued decline, Defendants have failed to substantively respond to the petition.

97.    Accordingly, Defendants have unlawfully withheld and/or unreasonably delayed their response to the Petition in violation of the APA. 5 U.S.C. §§ 555(b), 706(1).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

1. Declare that Defendants unreasonably delayed and unlawfully withheld their response to the Pelly petition in violation of the APA;

2. Enter an order enjoining Defendants from further delay in responding substantively to the Pelly petition and requiring such a response within 30 days;

3. Award Plaintiffs the costs of this action, including reasonable attorneys' fees; and

4. Grant any other relief this Court finds just and proper.

Dated:  December 14, 2022                    Respectfully submitted,

                                             */s/ Sarah Uhlemann*
                                             Sarah Uhlemann

Center for Biological Diversity
1037 NE 65th Street, #128
Seattle, WA 98115
(206) 327-2344
suhlemann@biologicaldiversity.org

*Attorney for Plaintiffs*