Slip Op. 23-89

# UNITED STATES COURT OF INTERNATIONAL TRADE

CENTER FOR BIOLOGICAL DIVERSITY, ANIMAL WELFARE INSTITUTE, and NATURAL RESOURCES DEFENSE COUNCIL, INC.,

    Plaintiffs,

v.

DEB HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior, and U.S. DEPARTMENT OF THE INTERIOR,

    Defendants.

Before: Gary S. Katzmann, Judge
Court No. 22-00339

## OPINION

[Parties' Joint Stipulation of Voluntary Dismissal with Prejudice was filed under USCIT Rule 41(a)(1)(A)(ii). The case is dismissed.]

Dated: June 14, 2023

Sarah Uhlemann, and Tanya M. Sanerib, Center for Biological Diversity, of Seattle, WA, argued for Plaintiffs Center for Biological Diversity, Animal Welfare Institute, and Natural Resources Defense Council, Inc.

Agatha Koprowski, Trial Attorney, U.S. Department of Justice, of Washington, D.C., argued for Defendants Deb Haaland, in her official capacity as Secretary of the U.S. Department of the Interior and U.S. Department of the Interior. With her on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director.

    Katzmann, Judge: The vaquita (Phocoena sinus), the world's smallest porpoise, is on the verge of disappearing from the Earth. As this court noted in 2020 in other litigation centering on the endangered vaquita, "[t]he vaquita is an evolutionarily distinct animal with no close relatives, whose loss would represent a disproportionate loss of biodiversity, unique evolutionary history,

and the potential for future evolution." Nat. Res. Def. Council, Inc. v. Ross ("NRDC IV"), 44 CIT __, __, 456 F. Supp. 3d 1292, 1294 (2020). Three years later, only ten to thirteen vaquita are estimated to remain in their endemic range of the Upper Gulf of California, located in the waters of Mexico.[1] The primary threat to their survival continues to be gillnet fishing, particularly of the totoaba fish (Totoaba macdonaldi), that incidentally entraps and drowns these five-foot-long pandas of the sea. Mexico has formally outlawed gillnet fishing of the totoaba, but illegal fishing activity in the Upper Gulf nonetheless continues. The vaquita's situation remains dire.

The court notes that on March 9, 2020, the United States banned the "importation from Mexico of all shrimp, curvina, sierra, chano, anchovy, herrings, sardines, mackerels croaker, and pilchard fish and fish products . . . caught with gillnets inside the vaquita's range" pursuant to the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1371. See Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act -- Notification of Revocation of Comparability Findings and Implementation of Import Restrictions; Certification of Admissibility for Certain Fish Products From Mexico, 85 Fed. Reg. 13626, 13627–28 (Dep't Com. Mar. 9, 2020); see also NRDC IV, 456 F. Supp. 3d at 1298. That statute -- the MMPA -- aims to protect marine mammals by setting forth standards applicable to both domestic commercial fisheries and foreign fisheries, like those in Mexico, that wish to export their products to the United States. See 16 U.S.C. § 1371(a)(2).

The embargo announced on March 9, 2020, by the United States followed years of litigation before this court between the environmental organizations in the instant action -- Plaintiffs Natural Resources Defense Council, Inc. ("NRDC"), the Center for Biological Diversity

---

[1] Armando Jaramillo-Legorreta et al., Survey Report for Vaquita Research 2023 at 1 (2023), https://iucn-csg.org/wp-content/uploads/2023/06/Vaquita-Survey-2023-Main-Report.pdf.

(the "Center"), and the Animal Welfare Institute ("AWI") -- and the United States.[2] In that litigation, the court issued a preliminary injunction on July 26, 2018, requiring the United States "to ban the importation from Mexico of all shrimp, curvina, sierra, and chano fish and their products caught with gillnets inside the vaquita's range." NRDC II, 331 F. Supp. 3d at 1383. Per Plaintiffs, that injunction prompted Mexico to issue regulations that, had they been enforced, would have potentially reduced vaquita bycatch. See Status Conference at 10:14, June 7, 2023, ECF No. 18. Plaintiffs, however, assert that enforcement has been lacking and that without urgent action that roots out illegal gillnet fishing in the Upper Gulf, the vaquita may soon disappear from the planet forever.

Seeking urgent action, Plaintiffs the Center, AWI, and NRDC brought this suit in 2022 against Defendants Secretary of the Interior, Deb Haaland, and the U.S. Department of the Interior (the "Interior"). Plaintiffs' Complaint alleged an unlawful delay by Defendants in responding to a 2014 letter requesting that the Secretary certify Mexico, under the Pelly Amendment to the Fishermen's Protective Act of 1967 for trade and taking of totoaba that "diminishes the effectiveness" of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). See Compl. ¶ 82, Dec. 14, 2022, ECF No. 4. The letter alleged that actions by Mexican nationals violated the treaty's prohibition on totoaba trade and contributed to the extinction of the vaquita and totoaba species. See id. ¶¶ 83–84. As detailed below, upon certification from the Secretary, the President may prohibit the importation of any product from the offending country for any duration in a manner consistent with other international trade

---

[2] See Nat. Res. Def. Council, Inc. v. Ross, 42 CIT __, 331 F. Supp. 3d 1338 (2018); Nat. Res. Def. Council, Inc. v. Ross ("NRDC II"), 42 CIT __, 331 F. Supp. 3d 1381 (2018); Nat. Res. Def. Council, Inc. v. Ross, 42 CIT __, 348 F. Supp. 3d 1306 (2018); Nat. Res. Def. Council, Inc. v. Ross, 774 F. App'x 646 (Fed. Cir. 2019); NRDC IV, 456 F. Supp. 3d 1292.

obligations.  See 22 U.S.C. § 1978(a)(2).  Congress has authorized the President to embargo, or threaten the embargo of, offending nations with the intention of encouraging foreign compliance with CITES and other instruments of international environmental law.  See infra pp. 5–6.

The parties entered into settlement discussions and reached a conditional settlement on April 6, 2023.  See Settlement Agreement ("SA"), Apr. 6, 2023, ECF No. 12-1.  On May 18, 2023, the Secretary certified to the President that "nationals of Mexico are engaging in taking and trade of the totoaba fish . . . and the related incidental take of vaquita . . . that diminishes the effectiveness of [CITES]."  Letters from Sec'y Deb Haaland, Dep't of the Interior, to Kamala Harris, Pres. of the S., and Kevin McCarthy, Speaker of the H.R., at 1 (May 26, 2023), https://www.doi.gov/sites/doi.gov/files/congressional-notification-letter-esb46-011731.pdf.

The parties accordingly filed a joint stipulation of dismissal with prejudice under USCIT Rule 41(a)(1)(A)(ii) on June 2, 2023.  See Joint Stipulation of Voluntary Dismissal with Prejudice ("Notice of Dismissal"), June 2, 2023, ECF No. 17.  With the certification to the President sought by the Complaint having been accomplished, the Complaint is dismissed by operation of the parties' Notice of Dismissal.

## BACKGROUND

### I. Legal Background

CITES is a multilateral treaty that protects endangered wildlife from international trade. See CITES, opened for signature Mar. 3, 1973, 27 U.S.T. 1087, 993 U.N.T.S. 243 (entered into force July 1, 1975).  The parties to CITES -- including the United States, Mexico, and 182 other states -- recognize that "wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems of the earth," and that "international co-operation is essential for the protection of [these] species . . . against over-exploitation through international

trade," with a "[c]onvic[tion] of the urgency of taking appropriate measures to this end." Id., pmbl. The treaty classifies endangered animal and plant wildlife into one of three Appendices, and different protections are associated with each Appendix. See id. arts. I(b)(ii)–(iii), II. Appendix I offers the most stringent protection of the three. It includes "all species threatened with extinction which are or may be affected by trade. Trade in specimens of these species must be subject to particularly strict regulation in order not to endanger further their survival and must only be authorized in exceptional circumstances." Id. art. II(1).

One way that Congress has authorized the Executive Branch to enforce the terms of CITES is through the Pelly Amendment to the Fishermen's Protective Act of 1967 (the "Pelly Amendment"). See Pelly Amendment, Pub. L. 92-219, 85 Stat. 786 (1971), amended by Act of Sept. 18, 1978, Pub. L. 95-376, 92 Stat. 714 (codified as amended at 22 U.S.C. § 1978). The Pelly Amendment accordingly requires that:

> When . . . the Secretary of the Interior, in consultation with the Secretary of State, finds that nationals of a foreign country, directly or indirectly, are engaging in trade or taking which diminishes the effectiveness of any international program for endangered or threatened species, the Secretary making such finding shall certify such fact to the President.

22 U.S.C. § 1978(a)(2). Upon certification from the Secretary, the President "may direct the Secretary of the Treasury to prohibit the bringing or the importation into the United States of any products from the offending country for any duration as the President determines appropriate," so long as the President's restrictions on "any products" are sanctioned by the World Trade Organization or other multilateral trade agreements. Id. § 1978(a)(5). The Secretary of the Interior must also "periodically monitor the activities of foreign nationals that may affect . . . international programs," "promptly investigate any activity by foreign nationals that, in the opinion of the Secretary, may be cause for certification," and "promptly conclude; and reach a decision with respect to; any investigation commenced." Id. § 1978(a)(3). CITES is unambiguously an

"international program for endangered or threatened species." See id. § 1978(h)(4); H.R. Rep. No. 95-1029, at 10–11 (1978).

Acknowledging that the threat of embargo can be "quietly persuading" to a foreign trading partner, the House Report accompanying the 1978 amendment to the Pelly Amendment emphasized that the act of certification was an effective tool in the Presidential toolbox to encourage foreign compliance with international environmental law. H.R. Rep. No. 95-1029, at 9. The legislation's initial scope in 1971 was limited to "international fishery conservation program[s]." See Pelly Amendment § 8(a), 85 Stat. at 786. But, intending to expand "the success the United States has achieved in the conservation of whales to the conservation of endangered and threatened species," the House Report made clear that the 1978 amendment would "give the United States some leverage in reducing the alarming international trade in endangered and threatened species."[3] H.R. Rep. No. 95-1029, at 9; see also Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 238, 240–41 (1986). The House Report further stated that "although the Endangered Species Convention represents a major step forward in the effort to reduce the rate of species extinction worldwide, it cannot, by itself, eliminate the international traffic in endangered species," and that the Pelly Amendment "would strengthen the Endangered Species Convention by providing the President with the authority to encourage other nations to comply with the

---

[3] Congress specifically noted that in 1974, the United States had initiated actions under the Pelly Amendment upon Commerce's certification that Japan and Russia were violating whaling quotas established by the International Whaling Commission ("IWC"). H.R. Rep. No. 95-1029, at 9. The threat of potential embargo against both nations was "generally regarded as convincing the Japanese and Russians to adhere to future IWC quotas," and President Ford did not impose embargoes on the fishery products of either nation after both nations agreed to abide by the decisions of the IWC in 1974. Id. at 9. Congress concluded that "[t]he 1974–75 actions dramatically demonstrate the value of the Pelly amendment to the United States in the conduct of international fishery negotiations," id., and hoped to apply the same pressure for the conservation of endangered and threatened species.

Convention." H.R. Rep. No. 95-1029, at 11. The Pelly Amendment was and remains key, therefore, to the United States' effective enforcement of CITES's provisions.

## II. Plaintiffs' Complaint

On September 29, 2014, the Center sent a letter to the Secretary requesting that the Secretary certify Mexico pursuant to the Pelly Amendment because Mexican nationals in the Gulf of California were engaging in the "taking" and "trade" of endangered totoaba that "diminishes the effectiveness" of CITES (the "Petition"). SA ¶ 3. The Center notified the Secretary of its intent to sue for Interior's failure to timely respond to the "Petition" on January 5, 2017. Id. ¶ 5. Interior responded to that notice in April 2017, stating that it anticipated concluding its Pelly Amendment investigation within the next four to five months. Id. ¶ 6. Interior did not conclude the investigation or substantively respond to the "Petition" in that timeframe or at any time before the filing of this action. Id. ¶ 7.[4]

Plaintiffs then filed this action in the U.S. Court of International Trade on December 14, 2022. See Compl. Plaintiffs requested (1) declaratory judgment that Defendants' failure to respond to the "Petition" constituted agency action unlawfully withheld or unreasonably delayed under the APA, 5 U.S.C. § 706(1); (2) an order enjoining Defendants from further delay in

---

[4] The indefinite delay prompted Plaintiffs Center and AWI to file a complaint in the U.S. District Court for the District of Columbia alleging that Defendants' failure to respond to the "Petition" constituted agency action unlawfully withheld or unreasonably delayed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1). Id. ¶ 8. Defendants filed a motion to dismiss for lack of subject matter jurisdiction. Mot. to Dismiss at 6–10, Ctr. for Bio. Diversity v. Bernhardt, No. 1:20-cv-01532 (D.D.C. Aug. 24, 2020), ECF No. 9 ("The Center's claim of unreasonable delay on its petition for Pelly Amendment certification may proceed only in the CIT." (citation omitted)). The plaintiffs filed a notice of voluntary dismissal without prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(i). See Notice of Voluntary Dismissal, Bio. Diversity, No. 1:20-cv-01532, ECF No. 11.

responding substantively to the "Petition" and requiring a response within thirty days; and (3) costs and attorneys' fees. Compl. at 24.

## DISCUSSION

As has been noted, the critically endangered vaquita inhabits only one region of the ocean -- the Upper Gulf of California in Northeast Mexico -- and faces one primary threat. Id. ¶¶ 42, 45. Gillnets, which are a type of fishing gear that hangs vertically in the water and captures large quantities of fish, also incidentally entrap and drown marine mammals and other wildlife. Id. ¶ 45. The vaquita's population decline has long been attributed to entanglement in gillnet gear set in fisheries located in the Upper Gulf, including in the illegal fishing of the totoaba. Id. ¶ 46. Totoaba inhabit the Gulf of California and parts of its annual spawning habitat overlap with the vaquita's habitat in the Upper Gulf. Id. ¶ 47. But because the totoaba's swim bladder is in high demand in parts of China for its purported medicinal properties and can sell on the black market for prices reaching $46,000 to $100,000 per kilogram by some reports, the totoaba itself has been subject to drastic overfishing, and its population has declined. Id. ¶¶ 48–49. Mexico outlawed totoaba fishing in 1975, but illegal fishing of the totoaba persists to this day. Id. ¶¶ 46, 48–49. The United States has listed both the vaquita and totoaba as endangered under the Endangered Species Act. See Endangered Fish or Wildlife; Cochito, 50 Fed. Reg. 1056 (Dep't Com. Jan. 9, 1985) (codified at 50 C.F.R. § 17.11(h)); Totoaba; Listing as an Endangered Species, 44 Fed. Reg. 29478 (Dep't Com. May 21, 1979) (codified at 50 C.F.R. § 17.11(h)).

### I. Efforts to Save the Vaquita in the CITES Framework

In 1979, the United Kingdom filed a proposal with the CITES Secretariat to include the vaquita in Appendix I. See U.K., Proposals Concerning the Cetacea, Conf. of the Parties to CITES, Second Meeting, Doc. 2.27 (Mar. 1979), https://www.speciesplus.net/api/v1/

documents/1132. At that time, there were "no estimates of [population] numbers, but the population is very localized and will be relatively small." Id. at 1044. The proposal explained that "[t]he exploitation of totoaba by gill nets dates from at least the late forties. . . . One day's catch is known to have been ten porpoises in the early seventies, and available information suggests an annual incidental kill of tens to hundreds." Id. at 1046 (citations omitted). The proposal underscored the "wide concern for [the vaquita's] survival." Id. at 1047. The CITES parties subsequently adopted the proposal and have included the vaquita in Appendix I since then. See CITES, Appendices I, II and III at 14 (May 21, 2023), https://cites.org/sites/default/files/eng/app/2023/E-Appendices-2023-05-21.pdf. The totoaba was also included in Appendix I in 1977 after the Mexican government banned totoaba fishing in 1975 due to population decline. See id. at 55; see also U.S., Proposal for Amendments to Appendices I and II at 261, Conf. of the Parties to CITES (Feb. 11, 1976), https://www.speciesplus.net/api/v1/documents/7725.

But despite the protections enabled by CITES, the population of the imperiled vaquita has continued to dwindle in intervening decades. And as illegal totoaba fishing has seemingly intensified in the Upper Gulf, see Compl. ¶¶ 53–58, international pressure on Mexico has escalated to prioritize the vaquita's survival and enforce its totoaba fishing ban. In 2022, the CITES Secretariat, the body administering CITES's committees and initiatives, concluded in no uncertain terms that a prior directive to Mexico by the CITES parties that it "effectively prevent fishers and vessels from entering the vaquita refuge area ha[d] not been implemented." CITES, Totoaba (Totoaba macdonaldi): Report of the Secretariat to the 74th Meeting of the Standing Committee ¶ 33, Lyon, France, SC74 Doc. 28.5 (Mar. 7–11, 2022).

The United States publicly raised at that meeting of the CITES Standing Committee that it "did not believe that CITES was being implemented effectively by Mexico, and . . . proposed that

the Standing Committee recommend the suspension of commercial trade in specimens of CITES-listed species exported or re-exported from Mexico until measurable progress is made by Mexico in implementing the recommendations proposed by the Secretariat." CITES, <u>Summary Record of the 74th Meeting of Standing Committee</u> at 57, Lyon, France, SC74 (Mar. 7–11, 2022). Among other monitoring and compliance directives, the Standing Committee "requested Mexico to strengthen measures to ensure that a 'zero tolerance policy' is strictly applied" and "encouraged Mexico to further scale up and expand maritime surveillance and patrol activities in the vaquita refuge and zero-tolerance area." <u>Id.</u> at 58. Subsequent actions by the CITES Standing Committee and Secretariat have increased the pressure on Mexico and resulted in a more concrete compliance plan.[5] But Mexico's progress in implementing that plan has yet to be reviewed, and serious international concern about the plight of the vaquita persists.[6]

---

[5] In November 2022, the Standing Committee requested that Mexico submit a "compliance action plan" that, if deemed inadequate by the Secretariat, would result in a recommendation to all parties to suspend all commercial wildlife trade with Mexico. CITES, <u>Summary Record of the 75th Meeting of Standing Committee</u> at 16–17, Panama City, Panama, SC75 (Nov. 13, 2022). The initial plan was deemed inadequate and the trade suspension recommendation was noticed on March 27, 2023; it was withdrawn on April 13, 2023, when an adequate plan was submitted. See CITES Secretariat, <u>Notification to the Parties</u>, No. 2023/046 (Apr. 13, 2023), https://cites.org/sites/default/files/notifications/E-Notif-2023-046.pdf.

[6] On a different track, the U.S. Trade Representative announced in February 2022 that the United States was requesting Environment Consultations with the Government of Mexico under the United States–Mexico–Canada Agreement ("USMCA") on "the protection of the critically endangered vaquita porpoise . . . , the prevention of illegal fishing, and trafficking of totoaba fish." Press Release, U.S. Trade Rep., USTR Announces USMCA Environment Consultations with Mexico (Feb. 10, 2022), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2022/february/ustr-announces-usmca-environment-consultations-mexico. Article 24.29.2 of the USMCA allows any state party to "request consultations with any other Party . . . regarding any matter arising under" Chapter 24 of the treaty, which contains provisions meant to, among other objectives, "promote high levels of environmental protection and effective enforcement of environmental laws." <u>See</u> Agreement Between the United States of America, the United Mexican States, and Canada, arts. 24.2.2, 24.29.2, July 1, 2020, Off. of the U.S. Trade Rep., https://ustr.gov/trade-agreements/free-trade-agreements/united-states-mexico-canada-agreement/agreement-between (last visited June 7, 2023). Indeed, the United States determined

## II. Interior's Certification and the Parties' Settlement

Following settlement negotiations, the parties to this litigation executed a Settlement Agreement on April 6, 2023. See SA. Paragraph 11 of the Settlement Agreement required Defendants (1) to "conclude, and reach a decision with respect to, Interior's Pelly Amendment investigation by either certifying or not certifying that nationals of Mexico are engaging in trade or taking which diminishes the effectiveness of CITES" on or before May 19, 2023; and (2) to "provide, on behalf of the Secretary, a substantive response to the 'Petition' in writing and conveyed via electronic mail within 15 days of the decision." Id. ¶ 11. The parties requested that the court stay the litigation to allow Defendants time to satisfy Paragraph 11, see Joint Mot. for Stay at 1, Apr. 7, 2023, ECF No. 12, and Plaintiffs "agree[d] to join with the United States in stipulating to the dismissal of this lawsuit with prejudice" upon Defendants' "timely performance of the commitments in Paragraph 11." SA ¶ 14. The court granted the Joint Motion to Stay and ordered that a status conference be held to discuss the status of the case. See Order at 2, Apr. 7, 2023, ECF No. 13.

On May 18, 2023, the Secretary certified to the President that "nationals of Mexico are engaging in taking and trade of the totoaba fish . . . and the related incidental take of vaquita . . . that diminishes the effectiveness of [CITES]." Letters from Sec'y Haaland, supra, at 1; see also 22 U.S.C. § 1978(a)(4) (requiring the Secretary to report to Congress, within fifteen days, a certification made to the President). She confirmed that "Interior, in consultation with the Department of State, has determined through a thorough investigation of the evidence that, despite international protections and commitments, the government of Mexico has failed to stem the illegal

---

that "available evidence raises concerns that Mexico may not be meeting a number of its USMCA environment commitments." U.S. Trade Rep., supra.

harvest and commercial export of totoaba." Letters from Sec'y Haaland, supra, at 1. She further stated that, consistent with the Pelly Amendment, the President will notify Congress of any action taken "to help encourage conservation actions to prevent the extinction of the vaquita and continued decline of the totoaba" within sixty days of the certification. Id.; see also 22 U.S.C. § 1978(b) (requiring the President to inform Congress within sixty days and, if no actions are taken, to "inform the Congress of the reasons therefor"). The President has thus far made no public comment on whether he will act on the Secretary's certification.

## CONCLUSION

The parties filed a joint stipulation of dismissal with prejudice under USCIT Rule 41(a)(1)(A)(ii) on June 2, 2023. See Notice of Dismissal at 1. The court held a status conference on June 7, 2023, in which the parties provided an overview of the case and recent efforts to save the vaquita, and confirmed that they intend to dismiss this action with prejudice. See Status Conference.[7] But today's dismissal is far from a bill of health for the vaquita. It is simply an acknowledgement that Plaintiffs brought one claim, and that one claim has been satisfied by Interior's decision to certify Mexico. As the court recognized in NRDC IV and stresses now, "every death [of the vaquita] brings it perilously close to disappearing from the planet forever. . . . [T]he need for vigorous international enforcement against its continuing threat is a compelling one." 456 F. Supp. 3d at 1299. The panda of the sea, the little cow, is irreplaceable.

---

[7] The audio recording of the status conference is available to the public on the website of the U.S. Court of International Trade. See Audio Recordings of Select Public Court Proceedings, U.S. Ct. of Int'l Trade, https://www.cit.uscourts.gov/sites/cit/files/060723-22-00339-GSK.mp3 (last visited June 14, 2023).

A voluntary dismissal by joint stipulation under Rule 41(a)(1)(A)(ii) is effective "automatically."  <u>Versata Software, Inc. v. Callidus Software, Inc.</u>, 780 F.3d 1134, 1136 (Fed. Cir. 2015).  The court declares the case **DISMISSED** by operation of the parties' filings.

**SO ORDERED.**

<u>/s/      Gary S. Katzmann   </u>
Gary S. Katzmann, Judge

Dated: <u>June 14, 2023</u>
      New York, New York